# UNITED STATES DISTRICT COURT

for the

Southern District of West Virginia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   2:10-mj-00005 |
| Safe deposit boxes of Dr. Diane E. Shafer located at the Williamson, West Virginia, branch of Branch Banking & Trust (BB&T) | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
Safe deposit boxes of Dr. Diane E. Shafer located at the Williamson, West Virginia, branch of Branch Banking & Trust (BB&T)

located in the _____ Southern _____ District of _____ West Virginia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

X evidence of a crime;

X contraband, fruits of crime, or other items illegally possessed;

❒ property designed for use, intended for use, or used in committing a crime;

❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 1347 | Health care fraud |
| 21 U.S.C. Section 846 | Conspiracy to distribute controlled substances |
| 21 U.S.C. Section 841(a)(1) | Distribution of controlled substances |
| 21 U.S.C. Section 843(a) | Obtaining controlled substances by fraud |

The application is based on these facts:

See attached Affidavit.

X Continued on the attached sheet.

❒ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*[FILED stamp: FILED ██ 19 2010   TERESA L. DE████████ CLERK   U.S. District ██████   Southern District ██ West Virginia]*

*Applicant's signature*

James F. Lafferty II, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ Jan 14, 2010 _____

*Judge's signature*

City and state: _____ Charleston, West Virginia _____

MARY E. STANLEY, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

1.  United States currency, precious metals, jewelry, safes, and financial instruments, including, but not limited to, stocks and bonds.

2.  Titles, books, records, receipts, bank statements and records, money drafts, letter of credit, money order and cashier's checks, receipts, passbooks, bank deposit tickets, safe deposit box keys, and memoranda and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment, and/or expenditure of money.

3.  Financial and business records, including, but not limited to, books, records, ledgers, journals, receipts, notes, memoranda, address books, and telephone books.

# A F F I D A V I T

STATE OF WEST VIRGINIA

COUNTY OF KANAWHA, to-wit:

I, James F. Lafferty II, being duly sworn, hereby depose and state:

1.   I am a Special Agent with the Federal Bureau of Investigation, and have served in this capacity as a Special Agent for approximately seven years. I am currently assigned to the Huntington, West Virginia Resident Agency where I have been assigned to focus my attention towards health care fraud and public corruption matters. Prior to joining the FBI, I received my Bachelor's of Science in Business Administration degree with a focus in accounting. In 1998, I obtained my Certified Public Accounting license, which is still active in the state of West Virginia.

2.   The FBI has provided me with training related to health care fraud matters, as well as financial forfeiture matters related to health care fraud and other criminal acts involving the illegal accumulation of assets.

3.   The information contained in this affidavit has been obtained by or provided to me by individuals knowledgeable of the subject matter, or by others in law enforcement who have provided me with information they have obtained during the ongoing investigation. Therefore, this affidavit does not include every fact gathered during the ongoing investigation, but simply includes

selected facts needed to obtain the probable cause to obtain a
seizure warrant for account(s) held at Branch Bank & Trust (BB&T).

## DIANE E. SHAFER, M.D.

4.    Diane E. Shafer, M.D., was born in 1952, and graduated
from Temple University School of Medicine, located in Pennsylvania,
in 1976. The West Virginia Board of Medicine website indicates that
Dr. Shafer's lists her primary specialty as orthopaedic surgery.
Her secondary specialty is listed as emergency medicine.    On
December 21, 2009, Dr. Shafer surrendered her license to the WV
Board of Medicine. It was originally granted on September 8, 1980.
Dr. Shafer owns and operates an office located at 114 West Second
Avenue, Williamson, Mingo County, West Virginia 25661. This is also
listed as her primary work location on the WV Board of Medicine
website.

5.    Your affiant has reviewed the West Virginia Board of
Medicine website for any disciplinary actions made against Dr.
Shafer. In 1988, Dr. Shafer was publicly reprimanded and fined
$2,500 by the board for misrepresenting the number of settlements
arising from medical professional liability in an application to
renew her license to practice medicine and surgery in the state of
West Virginia and for failing to inform the board that her
privileges to practice medicine at a Kentucky hospital had been
subject to disciplinary action. In March of 1989 the public
reprimand was withdrawn and set aside and the civil fine assessed

2

of and paid by Dr. Shafer in the amount of $2,500 was ordered to be returned. In 1993, Dr. Shafer's medical license was suspended after Dr. Shafer was convicted of bribing a public servant in the state of Kentucky. Her license was reinstated in April of 1995.

<u>INVESTIGATION</u>

6.  Investigation was initiated from numerous statements provided by individuals to the West Virginia State Police (WVSP) who alleged that Lisa Kaye Baisden, an employee of Dr. Shafer, had provided them with prescriptions signed by Dr. Shafer in exchange for cash or drugs.

7.  On December 1, 2009, members of the WVSP Bureau of Criminal Investigations approached Baisden at her home in Dingess, West Virginia. Baisden advised that she had been employed at Dr. Shafer's office, located in Williamson, West Virginia, for approximately seven years. Baisden's job responsibilities included maintaining daily "Patient Registers," which listed each "patient's" name, date of birth, and their payment method. Baisden was also responsible for billing private insurance companies, to the extent insurance was accepted as payment by Dr. Shafer.

8.  Baisden admitted during the interview that she had been providing patients at Dr. Shafer's office with fraudulent prescriptions for approximately twelve months. Baisden added that she had provided fraudulent prescriptions to approximately twenty to thirty patients on countless occasions. Baisden was compensated

3

by the patients with cash or a portion of the pills illegally obtained by the patients.

9.   Baisden advised that she knew she did not have prescriptive authority and that she and another employee of Dr. Shafer's would hand out the prescriptions to patients when Dr. Shafer was not in the office. Baisden stated that the office would remain open even if Shafer was out of town and that she had no way of contacting the doctor when she was gone. Dr. Shafer had directed the staff to continue handing out prescriptions to patients in her absence.

10.   Baisden advised that Dr. Shafer's employees were able to hand out the prescriptions in Dr. Shafer's absence because Dr. Shafer would fill out and sign the prescriptions and place them in the patient's file with the date left blank. The prescriptions were typically for hydrocodone, a Schedule III narcotic, and alprazolam, a Schedule IV narcotic.

11.   Baisden added that staff would inform Dr. Shafer when patients were going to be overlapping prescriptions by coming into the office for controlled substances before they should have taken all the drugs, if they were taken as prescribed.  Dr. Shafer would either disregard her staff or would change the date on the note that the staff would leave Dr. Shafer informing her of when the patient had last visited the office.

4

12.   Baisden also had in her possession thirteen days of Dr. Shafer's Patient Registers which she provided to the West Virginia State Police. Baisden advised that she had maintained the Patient Registers in the event that she would be confronted by law enforcement about her illegal activities. Baisden added that Dr. Shafer "sees" an inordinate amount of patients on a daily basis and that the average patients spends a matter of seconds with the doctor.

13.   Baisden advised that Dr. Shafer does not bill Medicare and that patients with Medicare pay only $20 per office visit, while patients without Medicare generally pay $75 an office visit.

14.   On December 4, 2009, a state search warrant signed by Magistrate Judge Eugene Crum was executed at Dr. Shaffer's office located in Williamson, West Virginia. During the execution of the search warrant, prewritten prescriptions were located. When asked by WVSP Corporal M.T. Smith why she was prewriting and signing prescriptions, Dr. Shafer advised that she did this so she would know what to give her patients. Also seized during the search warrant were over seventy five pre-written prescription forms for Dr. Shafer's patients. It should be noted that Dr. Shafer's handling of pre-signed prescriptions is a violation of West Virginia Code Section 30-3-14(c)(19), and is considered to be gross negligence in control and use of prescriptions.

5

15. The condition of Dr. Shafer's office during the execution of the search warrant indicated that it would be physically impossible for her to utilize her examining tables. (See photographs at Exhibit A.) She indicated that she examined her patients "at another location."

16. An analysis was conducted on the number of controlled substance prescriptions filled by Dr. Shafer's patients on December 1, 2009, against four other physicians from the Charleston, West Virginia area. On December 1, 2009, ninety five of Dr. Shaffer's patients filled controlled substance prescriptions in the state of West Virginia. This does not include Dr. Shafer's patients who fill their prescriptions at pharmacies located in Kentucky, which borders the Williamson, WV location of Dr. Shafer's office. For comparison purposes, two physicians who specialize in internal medicine were randomly selected. On December 1, 2009, a combined forty three patients for both physicians filled controlled substance prescriptions in the state of West Virginia. Two physicians who specialize in pain management were also selected randomly. On December 1, 2009, a combined forty two patients for both physicians filled controlled substance prescriptions in the state of West Virginia. Based on the analysis, Dr. Shafer's patients had more controlled substance prescriptions filled on December 1, 2009, than the combined patients of four physicians located in the Charleston, West Virginia area.

6

17. An individual concerned with activity at Dr. Shafer's office provided photographs he took in December of 2009 of Dr. Shafer's office during her regular office hours. In the photographs, the line of people which formed to see Dr. Shafer reached the sidewalk and continued down the street. Your affiant counted as many as thirty people waiting outside of the office. (See Exhibit B.)

18. An individual who has been a patient of Dr. Shafer for approximately three to four years advised that Dr. Shafer runs patients through her office "like cattle". On her initial office visit the individual did not receive a physical and the only medical test performed was a measurement of her weight. Dr. Shafer charged $150 to $200 on her initial visit and charged $75 for each subsequent visit. Dr. Shafer did not perform any medical examination of this individual, but provided the individual with her prescription. On occasion, Dr. Shafer would collect the exam fee herself.

19. Your affiant has reviewed patient files obtained during the search warrant executed by the WVSP. The files show that, for each office visit, a patient's blood pressure, weight, and ailments are listed on the chart. Your affiant did not see any doctor's notes of the visit or any referrals for treatment of the patient's ailments. Further substantiating Baisden's allegations that Dr. Shafer spends mere seconds with each patient.

7

20. A review of the West Virginia Board of Pharmacy doctor's report for Diane E. Shafer, MD revealed that in 2009 on 17,065 occasions, patients of Dr. Shafer filled controlled substance prescriptions in the state of West Virginia.

21. The West Virginia monitoring program keeps a running tally of the number of controlled substance prescriptions written under a physician's DEA number. Since the start of the program in approximately December of 2002 through the present, 118,445 controlled substance prescriptions have been filled under Dr. Shafer's DEA number at West Virginia pharmacies.

22. On December 15, 2009, after learning of a federal investigation into her alleged criminal conduct, Dr. Shafer signed a voluntary surrender of controlled substances privileges form, DEA Form-104. In this form, Dr. Shafer agreed to voluntarily surrender her controlled substances privileges in view of her alleged failure to comply with the Federal requirements pertaining to controlled substances.

23. On December 18, 2009, Dr. Shafer sent the West Virginia Board of Medicine a letter formally notifying the board that she was surrendering her license to practice medicine due to medical reasons. The surrender of the license was effective immediately.

## FINANCIAL INVESTIGATION

24.  As discussed earlier in the affidavit, Baisden provided thirteen days of Patient Registers that accounted for patients seen by Dr. Shafer at various dates throughout 2009. A review of the Patient Registers provided by Baisden reveals that, on average, Dr. Shafer "saw" one hundred and thirteen patients per day. Total cash intake for the thirteen day sample was approximately $89,000, not counting insurance payments. Daily cash intake for Dr. Shafer was approximately $6,800, not counting insurance payments.  A review of additional Patient Registers obtained by the WVSP during their search warrant of Dr. Shafer's office, leads this affiant to believe that the Patient Registers provided by Baisden were maintained properly and not altered by Baisden, considering the similarities between the Patient Registers provided by Baisden and those maintained by Dr. Shafer.

25.  Your affiant has been able to confirm through a review of the Patient Registers that Dr. Shafer opened her office four days a week. If Dr. Shafer and her staff opened the office fifty weeks out of the year, four days a week, Dr. Shafer's total cash intake would be approximately $1.36 million a year. This excludes funds obtained through the billing of insurance.

26.  Your affiant has reviewed checks provided by Mountain State Blue Cross Blue Shield, payable to Diane E. Shafer, MD. These checks were payments to Dr. Shafer for claims submitted by Dr.

9

Shafer for medical services performed on patients who utilized their health care coverage provided by Mountain State Blue Cross Blue Shield.

27. Your affiant reviewed checks from Mountain State Blue Cross Blue Shield dated: February 22, 2008, April 4, 2008, July 19, 2008, July 17, 2009, September 11, 2009, and November 20, 2009. A review of these checks revealed that these checks were deposited into a BB&T Bank account, account number ******6061.

28. Your affiant has reviewed an account for Diane E. Shafer, maintained at BB&T Bank, account number ******6061, for the months of December 2009 and January 2010.

29. The following deposits were identified in the month of December 2009:

| Date | Amount | Transaction Description |
|------|--------|------------------------|
| 12/7/2009 | $6,184.57 | Counter Deposit |
| 12/9/2009 | $5,408.00 | Counter Deposit |
| 12/10/2009 | $5,643.14 | Counter Deposit |
| 12/21/2009 | $12,412.34 | Deposit |
| 12/30/2009 | $4,137.70 | Deposit |
| 12/31/2009 | $4,534.00 | Deposit |

10

30.  The following deposits were identified in the month of January 2010:

| Date | Amount | Transaction Description |
|------|--------|-------------------------|
| 01/7/2010 | $11,817.49 | Deposit |
| 01/07/2010 | $6,000.00 | AM Cash Credit |
| 01/08/2010 | $3,000.00 | AM Cash Credit |
| 01/11/2010 | $6,428.00 | Deposit |
| 01/11/2010 | $6,000.00 | AM Cash Credit |
| 01/11/2010 | $5,678.50 | Deposit |
| 01/11/2010 | $5,000.00 | PM Cash Credit |
| 01/12/2010 | $5,326.96 | Deposit |
| 01/12/2010 | $5,000.00 | AM Cash Credit |

31.  Total deposits into Dr. Shafer's account in the month of December 2009 totalled $38,319.75. Total deposits into Dr. Shafer's account in the month of January 2010 totalled $54,250.95. The beginning cash balance for Dr. Shafer's checking account on December 1, 2009, was $6,472.46. The account balance as of January 13, 2010, was $67,876.

32.  On January 13, 2010, your affiant received information from BB&T Bank that on January 6, 2010, Dr. Shafer visited the Williamson, West Virginia branch of BB&T. Dr. Shafer asked a teller how much money she could deposit before the teller was obligated to report the amount of cash being deposited. Dr. Shafer explained that she needed to put $40,000 into her account by the middle of the month to pay her taxes. The teller explained that she would have to prepare a Currency Transaction Report (CTR) for any cash deposits over $10,000 and that she would need Dr. Shafer's identification in order to complete the paperwork. On January 12,

11

2010, Dr. Shafer returned to the same teller's window after 2:00 p.m. and deposited $5,900 in cash. She then returned to that same teller's window on January 13, 2010 before 2:00 p.m. She handed the teller $4,500 in cash to deposit but then asked the teller if she remembered how much she had deposited the previous evening. The teller informed her that she thought Dr. Shafer had deposited $5,900 the previous afternoon. Dr. Shafer asked that the teller give her back $500. Dr. Shafer then deposited $4,000.

33. Your affiant has also identified two additional accounts at BB&T Bank. The first account, account number ******1820, is a joint account Dr. Shafer maintains with Kevin Maynard and Sara T. Shafer. The balance in this account as of January 13, 2010, was $34,065. A second account, account number ******4279, is a joint account Dr. Shafer maintains with Sara T. Shafer. The balance in this account as of January 13, 2010, was $17,546. Your affiant also learned that Dr. Shafer has a certificate of deposit with BB&T Bank, certificate number ******8611, in the amount of $52,000.

34. Your affiant believes that Dr. Shafer is depositing cash she received from the illegal operation of her medical office in order to pay upcoming taxes that are due as she stated to the BB&T bank teller or for some other unknown purpose. Considering that Dr. Shafer's balance in checking account, account number ******6061, prior to learning that she was under investigation was $6,472.46, and is now $67,876 as of January 13, 2010, and the fact

12

that Dr. Shafer had stopped practicing medicine for a majority of December 2009 and all of January 2010, it appears to your affiant that Dr. Shafer has access to a large amount of cash funds that she is now for whatever purpose trying to introduce into the banking system.

35.  Dr. Shafer maintains two safe deposit boxes at BB&T, Williamson branch.  She had to get the second because the first was full.  It is likely that she secures cash, and other valuables in both safe deposit boxes which are the proceeds of her illegal activities described herein.  It is also likely that Dr. Shafer would secure:

    a.  Titles, books, records, receipts, bank statements and records, money drafts, letter of credit, money order and cashier's checks, receipts, passbooks, bank deposit tickets, safe deposit box keys, and memoranda and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment, and/or expenditure of money.

    b.  Financial and business records, including, but not limited to, books, records, ledgers, journals, receipts, notes, memoranda, address books, and telephone books.

Further, such cash and valuables would be evidence of said crimes.

<u>CONCLUSION</u>

36.  Based upon the foregoing, I submit that there is probable cause to believe that any and all proceeds on deposit in any and all bank accounts and certificates of deposit in the name of Diane E. Shafer, at Branch Banking & Trust (BB&T), up to the total amount

13

of $1,360,000.00 are forfeitable to the United States pursuant to 18 U.S.C. § 1347; 21 U.S.C. § 846; 21 U.S.C. § 841(a)(1); and/or 21 U.S.C. § 843(a)(3).

Further your affiant sayeth naught.

_____
JAMES F. LAFFERTY II

Sworn to before me, and subscribed in my presence, this 14th day of January 2010.

_____
MARY E. STANLEY
United States Magistrate Judge

14







GOVERNMENT
EXHIBIT
B